1  WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   Randall Mark Korelc,                  )   CIV 17-00355-PHX-JJT (MHB)
                                          )
10              Petitioner,               )   **REPORT AND RECOMMENDATION**
                                          )
11  vs.                                   )
                                          )
12  Charles Ryan, et al.,                 )
                                          )
13              Respondents.              )
                                          )
14  _____       )

15  TO THE HONORABLE JOHN J. TUCHI, UNITED STATES DISTRICT COURT:

16          Petitioner Randall Mark Korelc, who is confined in the Corrections Corporation of

17  America's Red Rock Correctional Center, has filed a pro se Petition for Writ of Habeas

18  Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1). Respondents filed an Answer (Doc. 7), and

19  Petitioner has filed a Reply (Doc. 10).

20                              **BACKGROUND**

21          On March 11, 2011, Petitioner was convicted in Maricopa County Superior Court,

22  case #2007-172851-001, of second-degree murder. He was sentenced to an 18-year term of

23  imprisonment. The Arizona Court of Appeals described the facts of this case as follows:

24          ¶2 In November 2007, Korelc was living in an apartment with R.G., his
            girlfriend. Late in the afternoon on November 9, 2007, Korelc drove to the
25          home of his son, C.K., and told him R.G. had "shot herself" and "was dead."
            Korelc told C.K. she had picked up his gun, pointed it at him, then "turned the
26          gun on herself." When he arrived at C.K.'s home, Korelc had in his hand his
            pistol, which police later confirmed through ballistics testing fired the shot that
27          killed R.G. Korelc told C.K. he had taken the gun out of R.G.'s hand and left
            the apartment. C.K. then asked his brother to call the police while he drove
28          Korelc to the apartment.

¶3 A police sergeant who arrived at the apartment testified it was "orderly" and he did not see "any signs of a struggle." When police entered the apartment, they found R.G. dead, sitting on a couch in the living room, with one leg up on the couch and one foot on the floor. R.G. had a single gunshot wound to the right side of her jaw, which the medical examiner testified "would kill somebody instantly." He further testified the crime scene photos "led [him] to believe ... [R.G.] did not move [after she was shot], which goes along with having been shot through the cervical spine and resulting in paralysis." And, the medical examiner and a detective both testified the position of the body, the location and type of wound, and the lack of gunshot residue on the body all negated the possibility of suicide.

¶4 In speaking with police after returning to the apartment, Korelc initially told them R.G. shot herself. When detectives interviewed Korelc later that evening, however, he said he had taken the gun from R.G. and admitted he was holding it four to five feet away from her when it went off.

(Doc. 7, Exh. EE at 2-3.)

On direct appeal, Petitioner raised the following claims: (1) the trial court erred when it allowed the State to introduce other act evidence; (2) the trial court abused its discretion when it precluded Petitioner from calling the murder victim's physicians to testify at trial; and (3) the trial court abused its discretion when it found that his statements to police were voluntary. (Doc. 7, Exh. BB.) The Arizona Court of Appeals rejected Petitioner's claims and affirmed his convictions, (Doc. 7, Exh. EE), and the Arizona Supreme Court denied review, (Doc. 7, Exh. FF).

Petitioner filed a timely notice of post-conviction relief and was appointed counsel. (Doc. 7, Exhs. GG, HH.) Petitioner's counsel, subsequently, filed a "Notice of Completion of Post-Conviction Review by Counsel," indicating she could not find any claims to raise. Counsel also requested additional time for Petitioner to file a pro se PCR petition. (Doc. 7, Exh. II.) Petitioner was granted three extensions of time, and he ultimately filed his PCR petition on September 24, 2013. (Doc. 7, Exhs. JJ-MM.) The trial court struck the petition because it was oversized and Petitioner failed to certify that he had raised all grounds known to him. (Doc. 7, Exh. NN.) Thereafter, Petitioner filed a revised PCR petition, which was accepted by the court. (Doc. 7, Exhs. OO, PP.) After briefing was completed, the trial court denied the PCR petition. (Doc. 7, Exhs. SS.) The court also denied a subsequent request for reconsideration. (Doc. 7, Exhs. TT, UU, WW.) The Arizona Court of Appeals accepted

review of Petitioner's delayed petition for review, but denied relief. (Doc. 7, Exhs. VV, XX, YY.)

In his habeas petition, Petitioner raises four grounds for relief. In Ground One, Petitioner alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated when the trial court admitted evidence of prior bad acts to demonstrate that Petitioner had a propensity for violence. (Doc. 1 at 6; Doc. 4.) In Ground Two, Petitioner claims that his Fifth, Sixth, and Fourteenth Amendment rights were violated when the trial court precluded the testimony of two expert witnesses that Petitioner wished to call. (Doc. 1 at 7; Doc. 4.) In Ground Three, he alleges that his Fifth and Sixth Amendment rights were violated when the trial court denied his motion to suppress evidence of involuntary statements he made to law enforcement officers. (Doc. 1 at 8; Doc. 4.) In Ground Four, Petitioner alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated when he received ineffective assistance of counsel. (Doc. 1 at 9; Doc. 4.) According to Petitioner, his counsel's performance was deficient because counsel failed to call certain witnesses and failed to request certain jury instructions. (Doc. 1 at 9; Doc. 4.)

In their Answer, Respondents argue that all of the claims alleged in Petitioner's habeas petition fail on the merits. Respondents additionally contend that Petitioner's Miranda claim alleged in Ground Three is procedurally defaulted.

## DISCUSSION

**A.** **Standards of Review**

**1.** **Merits**

Pursuant to the AEDPA[1], a federal court "shall not" grant habeas relief with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the state court decision was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court

---

[1] Antiterrorism and Effective Death Penalty Act of 1996.

proceeding. See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and delivering the opinion of the Court as to the AEDPA standard of review). This standard is "difficult to meet." Harrington v. Richter, 562 U.S. 86, 102 (2011). It is also a "highly deferential standard for evaluating state court rulings, which demands that state court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam) (citation and internal quotation marks omitted). "When applying these standards, the federal court should review the 'last reasoned decision' by a state court ... ." Robinson, 360 F.3d at 1055.

A state court's decision is "contrary to" clearly established precedent if (1) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 404-05. "A state court's decision can involve an 'unreasonable application' of Federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002).

## 2. Exhaustion and Procedural Default

A state prisoner must exhaust his remedies in state court before petitioning for a writ of habeas corpus in federal court. See 28 U.S.C. § 2254(b)(1) and (c); Duncan v. Henry, 513 U.S. 364, 365-66 (1995); McQueary v. Blodgett, 924 F.2d 829, 833 (9th Cir. 1991). To properly exhaust state remedies, a petitioner must fairly present his claims to the state's highest court in a procedurally appropriate manner. See O'Sullivan v. Boerckel, 526 U.S. 838, 839-46 (1999). In Arizona, a petitioner must fairly present his claims to the Arizona Court of Appeals by properly pursuing them through the state's direct appeal process or through appropriate post-conviction relief. See Swoopes v. Sublett, 196 F.3d 1008, 1010 (9th Cir. 1999); Roettgen v. Copeland, 33 F.3d 36, 38 (9th Cir. 1994).

Proper exhaustion requires a petitioner to have "fairly presented" to the state courts the exact federal claim he raises on habeas by describing the operative facts and federal legal theory upon which the claim is based. See, e.g., Picard v. Connor, 404 U.S. 270, 275-78 (1971) ("[W]e have required a state prisoner to present the state courts with the same claim he urges upon the federal courts."). A claim is only "fairly presented" to the state courts when a petitioner has "alert[ed] the state courts to the fact that [he] was asserting a claim under the United States Constitution." Shumway v. Payne, 223 F.3d 982, 987 (9th Cir. 2000) (quotations omitted); see Johnson v. Zenon, 88 F.3d 828, 830 (9th Cir. 1996) ("If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court.").

A "general appeal to a constitutional guarantee," such as due process, is insufficient to achieve fair presentation. Shumway, 223 F.3d at 987 (quoting Gray v. Netherland, 518 U.S. 152, 163 (1996)); see Castillo v. McFadden, 399 F.3d 993, 1003 (9th Cir. 2005) ("Exhaustion demands more than drive-by citation, detached from any articulation of an underlying federal legal theory."). Similarly, a federal claim is not exhausted merely because its factual basis was presented to the state courts on state law grounds – a "mere similarity between a claim of state and federal error is insufficient to establish exhaustion." Shumway, 223 F.3d at 988 (quotations omitted); see Picard, 404 U.S. at 275-77.

Even when a claim's federal basis is "self-evident," or the claim would have been decided on the same considerations under state or federal law, a petitioner must still present the federal claim to the state courts explicitly, "either by citing federal law or the decisions of federal courts." Lyons v. Crawford, 232 F.3d 666, 668 (9th Cir. 2000) (quotations omitted), amended by 247 F.3d 904 (9th Cir. 2001); see Baldwin v. Reese, 541 U.S. 27, 32 (2004) (claim not fairly presented when state court "must read beyond a petition or a brief ... that does not alert it to the presence of a federal claim" to discover implicit federal claim).

Additionally, a federal habeas court generally may not review a claim if the state court's denial of relief rests upon an independent and adequate state ground. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). The United States Supreme Court has explained:

> In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without the rule, a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.

Id. at 730-31. A petitioner who fails to follow a state's procedural requirements for presenting a valid claim deprives the state court of an opportunity to address the claim in much the same manner as a petitioner who fails to exhaust his state remedies. Thus, in order to prevent a petitioner from subverting the exhaustion requirement by failing to follow state procedures, a claim not presented to the state courts in a procedurally correct manner is deemed procedurally defaulted, and is generally barred from habeas relief. See id. at 731-32.

Claims may be procedurally barred from federal habeas review based upon a variety of factual circumstances. If a state court expressly applied a procedural bar when a petitioner attempted to raise the claim in state court, and that state procedural bar is both "independent"[2] and "adequate"[3] – review of the merits of the claim by a federal habeas court is ordinarily barred. See Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991) ("When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court.") (citing Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977) and Murray v. Carrier, 477 U.S. 478, 485-492 (1986)).

Moreover, if a state court applies a procedural bar, but goes on to alternatively address the merits of the federal claim, the claim is still barred from federal review. See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law. ...

---

[2] A state procedural default rule is "independent" if it does not depend upon a federal constitutional ruling on the merits. See Stewart v. Smith, 536 U.S. 856, 860 (2002).

[3] A state procedural default rule is "adequate" if it is "strictly or regularly followed." Johnson v. Mississippi, 486 U.S. 578, 587 (1988) (quoting Hathorn v. Lovorn, 457 U.S. 255, 262-53 (1982)).

In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity.") (citations omitted); <u>Bennett v. Mueller</u>, 322 F.3d 573, 580 (9th Cir. 2003) ("A state court's application of a procedural rule is not undermined where, as here, the state court simultaneously rejects the merits of the claim.") (citing <u>Harris</u>, 489 U.S. at 264 n.10).

A procedural bar may also be applied to unexhausted claims where state procedural rules make a return to state court futile. <u>See</u> <u>Coleman</u>, 501 U.S. at 735 n.1 (claims are barred from habeas review when not first raised before state courts and those courts "would now find the claims procedurally barred"); <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1230-31 (9th Cir. 2002) ("[T]he procedural default rule barring consideration of a federal claim 'applies only when a state court has been presented with the federal claim,' but declined to reach the issue for procedural reasons, or 'if it is clear that the state court would hold the claim procedurally barred.'") (quoting <u>Harris</u>, 489 U.S. at 263 n.9).

Specifically, in Arizona, claims not previously presented to the state courts via either direct appeal or collateral review are generally barred from federal review because an attempt to return to state court to present them is futile unless the claims fit in a narrow category of claims for which a successive petition is permitted. <u>See</u> Ariz.R.Crim.P. 32.1(d)-(h), 32.2(a) (precluding claims not raised on appeal or in prior petitions for post-conviction relief), 32.4(a) (time bar), 32.9(c) (petition for review must be filed within thirty days of trial court's decision). Arizona courts have consistently applied Arizona's procedural rules to bar further review of claims that were not raised on direct appeal or in prior Rule 32 post-conviction proceedings. <u>See, e.g.</u>, <u>Stewart</u>, 536 U.S. at 860 (determinations made under Arizona's procedural default rule are "independent" of federal law); <u>Smith v. Stewart</u>, 241 F.3d 1191, 1195 n.2 (9th Cir. 2001) ("We have held that Arizona's procedural default rule is regularly followed ["adequate"] in several cases.") (citations omitted), <u>reversed on other grounds</u>, <u>Stewart v. Smith</u>, 536 U.S. 856 (2002); <u>see also</u> <u>Ortiz v. Stewart</u>, 149 F.3d 923, 931-32 (9th Cir. 1998) (rejecting argument that Arizona courts have not "strictly or regularly followed" Rule 32 of the Arizona Rules of Criminal Procedure); <u>State v. Mata</u>, 185 Ariz. 319, 334-36,

916 P.2d 1035, 1050-52 (Ariz. 1996) (waiver and preclusion rules strictly applied in post-conviction proceedings).

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. See Reed v. Ross, 468 U.S. 1, 9 (1984). The federal court will not consider the merits of a procedurally defaulted claim unless a petitioner can demonstrate that a miscarriage of justice would result, or establish cause for his noncompliance and actual prejudice. See Schlup v. Delo, 513 U.S. 298, 321 (1995); Coleman, 501 U.S. at 750-51; Murray, 477 U.S. at 495-96. Pursuant to the "cause and prejudice" test, a petitioner must point to some external cause that prevented him from following the procedural rules of the state court and fairly presenting his claim. "A showing of cause must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded [the prisoner's] efforts to comply with the State's procedural rule. Thus, cause is an external impediment such as government interference or reasonable unavailability of a claim's factual basis." Robinson v. Ignacio, 360 F.3d 1044, 1052 (9th Cir. 2004) (citations and internal quotations omitted). Ignorance of the State's procedural rules or other forms of general inadvertence or lack of legal training and a petitioner's mental condition do not constitute legally cognizable "cause" for a petitioner's failure to fairly present his claim. Regarding the "miscarriage of justice," the Supreme Court has made clear that a fundamental miscarriage of justice exists when a Constitutional violation has resulted in the conviction of one who is actually innocent. See Murray, 477 U.S. at 495-96. Additionally, pursuant to 28 U.S.C. § 2254(b)(2), the court may dismiss plainly meritless claims regardless of whether the claim was properly exhausted in state court. See Rhines v. Weber, 544 U.S. 269, 277 (2005) (holding that a stay is inappropriate in federal court to allow claims to be raised in state court if they are subject to dismissal under § 2254(b)(2) as "plainly meritless").

**B.    Ground One**

In Ground One, Petitioner alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated when the trial court admitted evidence of prior bad acts to demonstrate

that Petitioner had a propensity for violence. (Doc. 1 at 6; Doc. 4.) Petitioner states that the "prior bad acts in which the Petitioner was acquitted on was used in his third second degree murder trial to gain an unlawful conviction which violates due process of law, as guaranteed by Amendments 6, 5 and 14th to the U.S. Constitution. *Ashe v. Swenson*, 397 U.S. 436, 443, 445-46 (1970)." (Doc. 1 at 12.)

In denying this claim on direct review, the Arizona Court of Appeals stated:

¶6 Korelc argues the superior court should not have allowed the State to introduce the other acts evidence that was the subject of the charges in the separate trials. He contends the superior court should have precluded this evidence under Arizona Rule of Evidence ("Rule") 404(b). We disagree. *State v. Lehr*, 227 Ariz. 140, 147, ¶ 19, 254 P.3d 379, 386 (2011) (appellate court reviews superior court's admission of other acts evidence for abuse of discretion).

¶7 Rule 404(b) prohibits the admission of evidence of other acts "to prove the character of a person in order to show action in conformity therewith" but allows admitting such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Other acts evidence is admissible if it is admitted for a proper purpose, relevant, not unfairly prejudicial under Rule 403, and if the court gives "an appropriate limiting instruction upon request." *State v. Nordstrom*, 200 Ariz. 229, 248, ¶ 54, 25 P.3d 717, 736 (2001) (citations omitted), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239, 243, ¶ 20, 274 P.3d 509, 513 (2012). In addition, the State must prove by clear and convincing evidence the other acts occurred and the defendant committed the acts. *State v. Terrazas*, 189 Ariz. 580, 584, 944 P.2d 1194, 1198 (1997) (citations omitted).

¶8 At trial, the State introduced other acts evidence through the testimony of I.F., a member of a local church where Korelc helped set up the church for rehearsals. I.F., who was in his late 70's, paid Korelc for helping at the church. According to I.F., two days before R.G.'s death, he went to Korelc's apartment and when he arrived, he saw Korelc and R.G. outside yelling at each other. Korelc was waiving his pistol, and R.G. was screaming at him to put it away. When R.G. told Korelc he might hurt someone, Korelc put the gun in her face and said, "[o]ne word more out of you, Bitch, and it's bang bang." When I.F. asked Korelc to put the gun down, he pointed the gun at I.F. and said, "[y]ou're next." After I.F. persuaded Korelc to sit down, he left without calling the police.

¶ 9 I.F. also testified that at approximately four o'clock in the afternoon on the day of R.G.'s death, Korelc telephoned him and told him he owed him money and he was coming over to get it. A short time later, Korelc and R.G. arrived at I.F.'s house in a car. When I.F. went out to greet them, Korelc pointed his pistol at him and demanded money. R.G. became upset and started screaming at Korelc. Although I.F. did not believe he owed Korelc any money, he nevertheless gave him $100 "because he said if I didn't, [he was] going to blow my head off." I.F. attempted to convince R.G. to get out of the car, but she refused stating, "No. No. No. He'll be all right. I'll clean him up. He'll be

- 9 -

all right. He'll be all right." Korelc and R.G. then left. The following day, after hearing about R.G.'s death, I.F. called the police to report he had information that might be relevant to her death.

¶10 Korelc first argues the superior court should have precluded this other acts evidence because the State failed to prove by clear and convincing evidence he committed these other acts. We disagree. Although Korelc was acquitted of the charges brought against him based on these other acts, "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." *Dowling v. United States*, 493 U.S. 342, 349, 110 S.Ct. 668, 672, 107 L.Ed.2d 708 (1990); *accord State v. Yonkman*, 229 Ariz. 291, 296–97, ¶¶ 18–21, 274 P.3d 1225, 1230–31 (App. 2012). Evidence is clear and convincing if it persuades the trier of fact "the truth of the contention is highly probable," *State v. Roque*, 213 Ariz. 193, 215, ¶ 75, 141 P.3d 368, 390 (2006) (quotations and citations omitted), and a victim's testimony can be sufficient to demonstrate by clear and convincing evidence an incident occurred. *State v. Vega*, 228 Ariz. 24, 29 n. 4, ¶ 19, 262 P.3d 628, 633 n. 4 (App. 2011) (citation omitted).

¶11 Further, contrary to Korelc's argument, I.F.'s testimony was not "incredible" because he had testified that although frightened with death multiple times he had not called police to report the threats or attempted to alert a nearby police officer during one of the incidents. Based on our review of the record, I.F.'s testimony was not so incredible that no reasonable person could believe it. *See State v. Williams*, 111 Ariz. 175, 177–78, 526 P .2d 714, 716–17 (1974) (citation omitted) (uncorroborated testimony by victim sufficient to establish proof beyond a reasonable doubt unless account "is physically impossible or so incredible that no reasonable person could believe it").

¶12 Korelc also argues the superior court should have precluded the other acts evidence because the State did not offer it for a proper purpose under Rule 404(b). We disagree. The incident two days before R.G.'s death involved Korelc threatening to shoot R.G. Evidence of prior threats or assaults by a defendant against a murder victim is properly admissible to show "motive and intent." *State v. Gulbrandson*, 184 Ariz. 46, 61, 906 P.2d 579, 594 (1995); *see also State v. Wood*, 180 Ariz. 53, 62, 881 P.2d 1158, 1167 (1994) ("Defendant's prior physical abuse of and threats against [victim] were relevant to show his state of mind and thus were properly admitted under Rule 404(b).").

¶13 The second incident, which occurred within two hours of R.G.'s death, was likewise admissible to show Korelc's state of mind at the time of the murder and to rebut his claim of accident. *See State v. Chaney*, 141 Ariz. 295, 309–10, 686 P.2d 1265, 1279–80 (1984) (evidence of other bad acts admissible because "jury was entitled to know under what conditions [defendant] was operating" at time of alleged offense); *United States v. Hillsberg*, 812 F.2d 328, 334 (7th Cir. 1987) (evidence of prior gun use on day of murder admissible because defendant's "erratic behavior on the day was germane in determining his state of mind at the time of the fatal shooting"); *State v. Kelley*, 664 A.2d 708, 710–11 (Vt. 1995) (citations omitted) (acts involving third parties that occurred just hours before murder had "great probative value," provided "the context in which the shooting took place," and were "probative of defendant's state of mind just prior to the shooting");

*Sturgis v. State*, 932 P.2d 199, 201–03 (Wyo. 1997) (evidence defendant threatened another person two days prior to shooting victim relevant to rebut defendant's claim of accident and show intent).

¶14 Finally, Korelc argues the superior court should have precluded the other acts evidence because it was unfairly prejudicial under Rule 403. Evidence is unfairly prejudicial when it has "an undue tendency to suggest a decision on an improper basis, such as emotion, sympathy, or horror." *Gulbrandson*, 184 Ariz. at 61, 906 P.2d at 594 (citation omitted). Here, the other acts evidence was clearly relevant to the critical issue of Korelc's state of mind at the time of the shooting and to his "accident" defense. Further, the superior court instructed the jury on the proper limited use of this evidence at the conclusion of Korelc's cross-examination of I.F. and again in the final instructions. Under these circumstances and because our supreme court has held "absent some evidence to the contrary," we presume the jury followed the instructions, *State v. Newell*, 178 Ariz. 116, 127, 871 P.2d 237, 248 (1994), the superior court did not abuse its discretion in admitting the other acts evidence over Korelc's Rule 403 objection. "Rule 403 weighing is best left to the trial court and, absent an abuse of discretion, will not be disturbed on appeal." *State v. Spencer*, 176 Ariz. 36, 41, 859 P.2d 146, 151 (1993).

(Doc. 7, Exh. EE at 4-10) (footnotes omitted).

In general, state law matters, including a trial court's evidentiary rulings, are not proper grounds for habeas corpus relief. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) (internal quotation omitted); see Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). Only if the admission of the evidence was so prejudicial as to offend due process may the federal courts properly consider it. See, e.g., Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).

The United States Supreme Court has "very narrowly" defined the category of infractions that violate the due process test of fundamental fairness. See Dowling, 493 U.S. at 352. Pursuant to this narrow definition, the Court has declined to hold that evidence of other crimes or bad acts is so extremely unfair that its admission violates fundamental conceptions of justice. See Estelle, 502 U.S. at 75 & n.5. Thus, there is no clearly established Supreme Court precedent which holds that a state violates due process by admitting evidence of prior bad acts. See, e.g., Bugh v. Mitchell, 329 F.3d 496, 512–13 (6th Cir. 2003) (state court decision allowing admission of evidence pertaining to petitioner's alleged prior,

uncharged acts of child molestation was not contrary to clearly established Supreme Court precedent because there was no such precedent holding that state violated due process by permitting propensity evidence in the form of other bad acts evidence).

Moreover, although "clearly established Federal law" under the AEDPA refers only to holdings of the United States Supreme Court, the Court notes that even under Ninth Circuit precedent Petitioner would not be entitled to relief. The Ninth Circuit has held that the admission of "other acts" evidence violates due process only if the evidence is "of such quality as necessarily prevents a fair trial." Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986).

Lastly, the Court notes that "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." Dowling, 493 U.S. at 349. In Dowling, the Court upheld the admission of prior acts for which Dowling had been acquitted, because the standard under Fed.R.Evid. 404(b) for admission of prior acts was whether "'the jury can reasonably conclude that the act occurred and that the defendant was the actor.'" Id. at 348 (quoting Huddleston v. United States, 485 U.S. 681, 689 (1988)). This standard was lower than the "reasonable doubt" standard required for conviction for those same acts. "If an act that could have been proved to a lesser degree than that required for conviction is for some reason probative in a subsequent trial, it need not be excluded because of the prior acquittal." United States v. Seley, 957 F.2d 717, 723 (9th Cir. 1992). Thus, the second Dowling jury could determine under a lower standard of proof that Dowling committed the prior act, even though a previous jury was unable to determine he committed that act beyond a reasonable doubt.

In this case, the Court finds that the admission of the contested evidence does not constitute a basis for habeas relief. There was no violation of clearly established federal law, and there was no due process violation because admission of the evidence did not render Petitioner's trial unfair. The contested evidence was limited as it was admitted for proper purpose pursuant to Rule 404(b), it was properly admitted under the clear and convincing standard, see State v. Terrazas, 189 Ariz. 580, 944 P.2d 1194, 1198 (1997) (en banc), and the

contested evidence had minimal impact given the amount of other evidence implicating

Petitioner. Furthermore, at the close of trial (and at the conclusion of Petitioner's cross-

examination of "I.F."), the court gave the following limiting instruction:

> Other acts. Evidence of other acts has been presented. You may consider -- that should say these acts only if you find that the State has proved by clear and convincing evidence that the defendant committed these acts. You may only consider these acts to establish the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. You must not consider these acts to determine the defendant's character or character trait or to determine that the defendant acted in conformity with the defendant's character or character trait and, therefore, committed the charged offense.

Accordingly, the Court finds that the state court decision is neither contrary to nor an

unreasonable application of clearly established federal law. Petitioner is not entitled to relief

on Ground One.

**C.     Ground Two**

In Ground Two, Petitioner claims that his Fifth, Sixth, and Fourteenth Amendment

rights were violated when the trial court precluded the testimony of two expert witnesses that

Petitioner wished to call. (Doc. 1 at 7; Doc. 4.) Petitioner states that "the defense wanted to

call two of the victim's doctors to testify in the Petitioner's murder trial Dr. Wong and Dr.

Sullivan," but that "the state filed a motion to preclude the testimony of both doctors." (Doc.

1 at 7.) Petitioner cites Celaya v. Stewart, 691 F.Supp.2d 1046 (D. Ariz. 2010) in support of

his argument. (Doc. 1 at 14-17.)

In denying this claim on direct review, the Arizona Court of Appeals stated:

> ¶15 Korelc argues the superior court violated his right to present a complete defense by precluding him from calling two doctors to testify regarding R.G.'s medical records. "Although a defendant has a fundamental constitutional right to present a defense, the right is limited to the presentation of matters admissible under ordinary evidentiary rules, including relevance." *State v. Dickens*, 781 Ariz. 1, 14, 926 P.2d 468, 481 (1996) (citation omitted), *abrogated on other grounds by Ferrero*, 229 Ariz. at 243, ¶ 20, 274 P.3d at 513. *See also Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973) ("[T]he accused . . . must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."). As we explain, the superior court did not abuse its discretion in precluding this testimony. *State v. Rutledge*, 205 Ariz. 7, 10, ¶ 15, 66 P.3d 50, 53 (2003) (citation omitted) (appellate court reviews rulings on relevance and admissibility of evidence for abuse of discretion).

¶16 Before trial, Korelc moved for disclosure of R.G.'s medical records, including records of Dr. S., asserting the records might contain exculpatory evidence that would support his "accident" defense and show R.G. was "acting irrationally" the day of the shooting and "had not taken prescribed medications for mental health issues as well as seizure issues." Over the State's opposition, and after the superior court agreed to review the records in camera and continue the trial (then scheduled for April 12, 2010), it provided copies of the records to the parties on May 11, 2010 without deciding whether the records were relevant or admissible.

¶17 On August 10, 2010, Korelc moved for disclosure of R.G.'s medical records from Dr. W., stating that after reviewing Dr. S.'s records he had learned Dr. W. had also seen R.G. He again asserted the records might support his defense R.G.'s shooting was an accident. Because as of the date of Korelc's motion the court had scheduled trial for September 8, 2010, it denied his motion as insufficient and untimely.

¶18 Subsequently, the superior court rescheduled trial for November 9, 2010. On October 26, 2010, the court reconsidered Korelc's request for Dr. W.'s medical records and ordered defense counsel to prepare an order for production of the records for in camera review. Due in part to delay in submitting the order to the superior court, the court did not receive the records until the morning of trial. During a pretrial conference held the day before—on November 8, 2010—the court and counsel discussed the situation, and the court stated it would affirm the next day's trial date unless the parties had a "different proposal." The court explained it did not want to cancel the trial date based on speculation the records might contain relevant information, but stated it would continue the trial if the records were significant. Korelc did not object to the court's approach.

¶19 On November 9, 2010, before jury selection, the superior court advised the parties it had received Dr. W.'s records and had not found anything "likely to be relevant." Nevertheless, "out of an abundance of caution" and "to have [its] assessment be transparent," the court provided copies of the records to the parties "because [it] granted the defense a right to access the victim's medical records under a very broad concept of materiality." The court also granted Korelc's request to begin jury selection later in the day so counsel could review the records.

¶20 After the recess, the State moved to preclude testimony from R.G.'s doctors, arguing their testimony would not be "even remotely pertinent" to the case, because neither doctor had treated R.G. for "any sort of mental disturbances or mental disorders." In response, Korelc moved to continue the trial so he could interview Dr. W. and have an expert review Dr. W.'s notes. In support of the motion, defense counsel argued:

> I point out just a month before being treated, the victim was reporting seizures, full jerking seizures with smaller seizures going on. If those seizures can be caused—and because they're generalized, we don't know for sure, but it's certainly a possibility, and it runs to the defense that when these two individuals, my client and the victim, got in an argument that particular day, that could have triggered a seizure. That could have triggered the fight over the gun with the gun accidentally discharging. So, therefore, it does run straight to the defenses.

- 14 -

Defense counsel also noted R.G. was on medication, including seizure medication, with the amounts being adjusted because of side effects, and stated, "it would be nice to be able to now interview Dr. [W.] and find out exactly what these things even mean."

¶21 When asked by the superior court to clarify how the doctors' testimony would be relevant, defense counsel stated he could not do so until he hired an expert to review the records and "make a determination." To that, the State noted all of Dr. W.'s records, except for two pages, were in the records previously provided by Dr. S. and given to defense counsel months earlier, and further argued the records failed to support Korelc's defense. The superior court denied Korelc's motion to continue and granted the State's motion to preclude the doctors' testimony, stating the parties had received sufficient notice of the contents of the medical records and Dr. W.'s records did not add anything significantly new to those previously disclosed.

¶22 On this record, the superior court did not abuse its discretion in precluding the doctors' testimony. *See* Ariz. R. Evid. 402 ("Evidence which is not relevant is not admissible."). Defense counsel could only speculate that R.G.'s medical records and history would be relevant to Korelc's defense-at best, he only suggested a possibility that, after further review of the records by an expert, R.G.'s medical history might be relevant. *See State v. Machado*, 224 Ariz. 343, 357 n. 11, ¶ 33, 230 P.3d 1158, 1172 n.11 (App. 2010) (quotation and citation omitted) (defendant not entitled to "throw strands of speculation on the wall and see if any of them will stick").

(Doc. 7, Exh. EE at 10-14.)

The U.S. Constitution gives a criminal defendant the right to present a defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted). The Compulsory Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory process for obtaining a favorable witness. See Washington v. Texas, 388 U.S. 14, 19 (1967). The Sixth Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Chambers v. Mississippi, 410 U.S. 284, 295 (1973); Taylor v. Illinois, 484 U.S. 400, 410-11 (1988) (right to compulsory process is not absolute). A defendant "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor, 484 U.S. at 410. States have the power to "exclude evidence

- 15 -

through the application of evidentiary rules that themselves serve the interests of fairness and reliability," and judges have wide latitude to exclude evidence that is "marginally relevant" or would cause confusion of the issues. <u>Crane</u>, 476 U.S. at 689–90. Even relevant evidence may be excluded on account of certain evidentiary rules. <u>See</u> <u>Montana v. Egelhoff</u>, 518 U.S. 37, 42 (1996). "[T]o say that the right to introduce relevant evidence is not absolute is not to say that the Due Process Clause places *no* limits upon restriction of that right. But it is to say that the defendant asserting such a limit must sustain the usual heavy burden that a due process claim entails[.]" <u>Id.</u> at 42-43. Even if the exclusion of evidence was a constitutional error, habeas relief is not available unless the erroneous exclusion had a "'substantial and injurious effect or influence in determining the jury's verdict.'" <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993).

The Court finds that the state court's decision concluding that the superior court did not abuse its discretion in precluding the doctors' testimony regarding the victim's medical records was neither contrary to nor an unreasonable application of clearly established federal law.

Petitioner claims that Drs. Wang and Sullivan would have testified to "the fact that they were treating her for mental issues and seizures full jerking seizures which could have caused the gun to go off accidentally," and that the victim's "anxiety and emotional state could escalate during a struggle for the gun triggering a seizure causing the gun to discharge." Petitioner's claims, as noted by the state court, are entirely speculative. Just as the court and the parties could not find any relevant information in the doctors' medical records to demonstrate how the doctors' testimony might be relevant based on those records, here, Petitioner has failed to establish relevance of the doctors' testimony beyond his conclusory statements. Petitioner has not identified any Supreme Court holding to the effect that the right to present a defense includes a right to present irrelevant evidence. Indeed, the requirement that evidence must be relevant to be admissible is a core evidentiary rule.

Moreover, although Petitioner's initial statements to the police changed multiple times, and he claimed that everything happened so fast, Petitioner ultimately confirmed, and

the evidence presented at trial demonstrated, that the victim's hand was not on the weapon when it discharged. And, at no time during his interviews with police or during his testimony did Petitioner claim that the victim was having a seizure or other medical complication prior to being shot.

Petitioner citation to <u>Celaya v. Stewart</u>, 691 F.Supp.2d 1046 (D. Ariz. 2010), is not persuasive. In <u>Celaya</u>, the defendant was claiming that she shot the victim in self-defense after the victim picked her up, drove her to an isolated location, and sexually assaulted her. Defendant sought to call three witnesses who would have testified about two prior occasions where the victim drove prostitutes to isolated locations and sexually attacked them. The state trial court excluded the evidence as inadmissible character evidence since there was no evidence that the defendant had known about these incidents beforehand. Acknowledging that "[a] state trial court's admission of evidence under state evidentiary law will form the basis for federal habeas relief only where the evidentiary ruling 'so fatally infected the proceedings as to render them fundamentally unfair' in violation of the petitioner's due process rights," the federal court held that "this is such a case because the trial court's evidentiary rulings prevented the Petitioner from meaningfully presenting a complete defense." <u>Id.</u> at 1055-56.

The federal court found that the proffered testimony should have been admitted under Rule 404(b) because it would have corroborated the defendant's account of the victim's abnormal behavior. <u>See id.</u> at 1057-59. Noting that the trial court "erred by failing to fully consider the admission of specific act evidence under Rule 404(b) for the purpose of corroborating Petitioner's version of events, and to show the victim's motive and intent to sexually assault Petitioner," the federal court found that the prejudice to the defendant was further compounded because the State had opened the door to such evidence by attacking the defendant's credibility and disputing defendant's account of what occurred. <u>See id.</u>

In this case, and contrary to the facts in <u>Celaya</u>, Petitioner only speculates as to these witnesses' proposed testimony and whether any of them would have testified as he alleges. Again, the medical records that the doctors' testimony would have based upon failed to

contain any relevant information. The proposed doctors' testimony would not have corroborated Petitioner's theory of defense as Petitioner never claimed that the victim's hand was on the gun and she had a seizure just before the gun discharged.

The Court finds no error.

**D. Ground Three**

In Ground Three, Petitioner alleges that his Fifth and Sixth Amendment rights were violated when the trial court denied his motion to suppress evidence of involuntary statements he made to law enforcement officers "and allowed those statement[s] to be used for impeachment purpose[s] and police officers used his statement[s] against him after he requested an attorney and his request for an attorney was denied ... ." (Doc. 1 at 8, 17; Doc. 4.) Specifically, Petitioner alleges his statements to the police were involuntary, contending: (1) he "was surrounded by police officers and they denied him to be able to speak to his son and an attorney"; (2) he was "interrogated for approximately 9 hours"; (3) although he was given <u>Miranda</u> warnings, "he didn't understand his rights"; (4) an "officer was informed that the Petitioner didn't understand his *Miranda* warnings and he told the officers that he would 'straighten out' the problem"; (5) he was told he was "not free to leave until he was tested for gunshot residue and the test took place before the interrogation"; (6) "Petitioner's clothing was collected"; (7) "Petitioner indicated his concern in answering the questions during the interrogation[] without an attorney the detective asked the Petitioner if he thought he needed an attorney ... the Petitioner stated that he did the detective Lockerby answered OK"; (8) "the detective told the Petitioner he wasn't in the Petitioner's shoes and couldn't tell him if he would want an attorney"; and (9) when Petitioner was interviewed by another detective, "he was not read his *Miranda* warnings ... ." (Doc. 1 at 17-19.)

Before trial, Petitioner filed a motion to suppress his statements to police, arguing that his statements were: (1) involuntary; (2) made in violation of his right to counsel; and (3) taken in violation of <u>Miranda v. Arizona</u>, 348 U.S. 436 (1966). (Doc. 7, Exh. B.) The trial court conducted an evidentiary hearing on June 26, 2009. (Doc. 7, Exh. F.) Following the hearing and supplemental briefing by the parties, the trial court denied Petitioner's motion

to suppress stating that "Defendant's statements to Officer Reed, Officer Kiricoples, Detective Lockerby, Detective Van Meter, and Sergeant Nichols were made voluntarily at a time when Defendant was not under arrest or unlawful detention." (Doc. 7, Exh. D.)

On direct appeal, Petitioner argued that the trial court abused its discretion when it denied his motion to preclude his involuntary statements to law enforcement and allowed the statements to be used for impeachment purposes. (Doc. 7, Exh. BB at 28-36.) Petitioner did not allege a <u>Miranda</u> claim. (Doc. 7, Exh. BB at 28-36.) In denying this claim, the Arizona Court of Appeals stated:

> ¶23 Finally, Korelc argues his statements to the police were involuntary and, thus, the superior court should not have allowed the State to impeach him with those statements when he testified at trial. We disagree.

> ¶24 Only voluntary statements made to law enforcement are admissible at trial. *State v. Ellison*, 213 Ariz. 116, 127, ¶ 30, 140 P.3d 899, 910 (2006) (citations omitted). And, in Arizona, confessions and incriminating statements made to police are presumed involuntary and the State bears the burden of showing by a preponderance of the evidence the statements were voluntary. The critical question is whether the "defendant's will was overborne." *State v. Newell*, 212 Ariz. 389, 399, ¶ 39, 132 P.3d 833, 843 (2006) (citation omitted). To decide this question, a court must examine the totality of the circumstances surrounding the giving of the statements. *Id.* These circumstances include the environment of the interrogation; whether *Miranda* warnings were given; the duration of the interrogation; and whether there was impermissible police questioning. *State v. Blakely*, 204 Ariz. 429, 436, ¶ 27, 65 P.3d 77, 84 (2003) (citation omitted). Additionally, there must be a "causal relation between the coercive behavior and the defendant's overborne will." *State v. Boggs*, 218 Ariz. 325, 336, ¶ 44, 185 P.3d 111, 122 (2008) (citation omitted). We review a superior court's determination of voluntariness for clear and manifest error, which is shorthand for abuse of discretion. *State v. Jones*, 203 Ariz. 1, 5, ¶ 8, 49 P.3d 273, 277 (2002) (citation omitted); *see also Newell*, 212 Ariz. at 396, 396 n. 6, ¶ 22, 132 P.3d at 840, 840 n. 6 (citations omitted). Under this standard of review we will not second guess a superior court's factual determinations; however, to the extent its ultimate ruling is a conclusion of law, our review is de novo. *Jones*, 203 Ariz. at 5, ¶ 8, 49 P.3d at 277 (quotation and citation omitted); *State v. Zamora*, 220 Ariz. 63, 67, ¶ 7, 202 P.3d 528, 532 (App. 2009) (citations omitted).

> ¶25 At the evidentiary hearing on Korelc's motion to suppress, the police officers who questioned him testified that Officer E.R. questioned Korelc initially and briefly at the apartment. Then, with Korelc's consent, two police detectives questioned him at a nearby senior center close to his apartment. One of the detectives testified that after police had tested Korelc for gunshot residue and impounded his clothes (giving him paper clothes to wear), Korelc was free to leave. Although the interview lasted almost six hours inclusive of breaks, Korelc was not handcuffed and police gave him opportunities to "get up, walk around, use the bathroom, [and] get water." The record reflects the detectives' questions were investigatory rather than accusatory in nature. The

detectives were in the process of making arrangements to drive Korelc home when another police officer, Detective J.N., arrived to question Korelc about certain inconsistencies between his statements to police and the physical evidence. Korelc was not under arrest, and all of the police officers who testified at the hearing denied making any promises or threats of any kind to Korelc during their questioning. *See Ellison*, 213 Ariz. at 127–28, ¶ 31, 140 P.3d at 910–11 (quotation and citation omitted) ("[A] prima facie case for admission of a confession is made when the officer testifies that the confession was obtained without threat, coercion or promises of immunity or a lesser penalty."). Transcripts of the police questioning of Korelc bear this out. And finally, the record fails to contain any evidence that Korelc's age, education, or intelligence made him susceptible to coercion.

¶26 Despite these circumstances, Korelc argues police coerced his statements because they failed to determine whether he had understood the *Miranda* warnings Officer E.R. had given him at the apartment, and then, at the senior center, failed to either make sure he had understood the warnings or re-*Mirandized* him and, instead, in violation of his *Miranda* rights, continued to question him after he "unambiguously" requested an attorney. Although *Miranda* and voluntariness are separate inquiries, *State v. Montes*, 136 Ariz. 491, 494, 667 P.2d 191, 194 (1983), and a "voluntary confession obtained in violation of *Miranda* may be used to impeach a witness," *State v. Huerstel*, 206 Ariz. 93, 107, ¶ 61, 75 P.3d 698, 712 (2003), a *Miranda* violation is nevertheless relevant to whether a person's will has been overborne sufficiently to render a confession involuntary. When *Miranda* warnings are required but not given, that factor weighs against a finding of voluntariness. *State v. Pettit*, 194 Ariz. 192, 196, ¶¶ 17, 19, 979 P.2d 5, 9 (App. 1998) (citations omitted).

¶27 Here, although Officer E.R. testified he gave Korelc the *Miranda* warnings at the apartment in an overabundance of caution, the record does not reflect he was required to do so. This is because Korelc was not in custody. *Stansbury v. California*, 511 U.S. 318, 322–23, 114 S.Ct. 1526, 1528–29, 128 L.Ed.2d 293 (1994) (quotations and citations omitted) (defendant in custody and entitled to *Miranda* warnings when formally arrested or when freedom of movement restrained to the degree associated with formal arrest; whether interrogation is custodial determined by objective circumstances of interrogation and not subjective views of either the interrogating officer or the person being questioned). And, although the record fails to demonstrate whether Korelc actually understood the *Miranda* warnings given to him by Officer E.R., he was not in custody when the two detectives questioned him at the senior center. As discussed, their questioning was investigational, and indeed they were in the process of making arrangements to take Korelc home when Detective J.N. arrived. Further, the record does not reflect that in response to the two detectives' questions, Korelc made an "unambiguous" request for a lawyer which would have signaled to them that they should stop the interview. *See generally Davis v. United States*, 512 U.S. 452, 458–59, 114 S.Ct. 2350, 2354–55, 129 L.Ed.2d 362 (1994) (after *Miranda* warnings, police must cease interrogation until counsel is present if defendant unambiguously requests counsel). At best, as borne out by the transcript of the interview, Korelc simply appears to have asked the two detectives to express an opinion as to what they would do if they were in his "shoes."

¶28 To be sure, with the arrival of Detective J.N. to question Korelc about inconsistencies between his statements and the physical evidence, police had

begun to suspect Korelc had shot R.G. but not in a struggle as he had described. But, their "focus" does not mean the questioning had become a custodial interrogation. *Id.* at 323–24; *State v. Cruz–Mata*, 138 Ariz. 370, 373, 674 P.2d 1368, 1371 (1983). But, even if we assume Detective J.N.'s arrival turned a non-custodial investigatory interview into a custodial interrogation and police should have then advised Korelc of his *Miranda* rights, the record fails to reflect Detective J.N. made any promises or threats to Korelc or his questions forced, intimidated, or coerced Korelc into explaining what had actually happened in the struggle with R.G. over the gun—that he had wrestled the gun away from R.G., turned it towards her, and as he was stepping away from her, the gun discharged.

¶29 Reviewing the totality of the circumstances, we cannot say the superior court abused its discretion in finding Korelc's statements to police voluntary. Accordingly, the State was entitled to use those statements to impeach Korelc at trial.

(Doc. 7, Exh. EE at 15-21) (footnotes omitted).

### 1. Miranda Violation

Petitioner appears to suggest that his statements to police were obtained in violation of <u>Miranda</u>. In <u>Miranda</u>, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her. <u>See id.</u> at 473–74. These procedural requirements are designed "to protect people against the coercive nature of custodial interrogations." <u>DeWeaver v. Runnels</u>, 556 F.3d 995, 1000 (9th Cir. 2009). Once <u>Miranda</u> warnings have been given, if a suspect makes a clear and unambiguous statement invoking his constitutional rights, "all questioning must cease." <u>Smith v. Illinois</u>, 469 U.S. 91, 98 (1984). <u>See also</u> <u>Miranda</u>, 384 U.S. at 473–74; <u>Michigan v. Mosley</u>, 423 U.S. 96, 100 (1975); <u>DeWeaver</u>, 556 F.3d at 1001.

Initially, the Court notes that Petitioner failed to fairly present a <u>Miranda</u> claim to the state courts. Indeed, the heading of Petitioner's Opening Brief on direct appeal states: "Did the trial court abuse its discretion when it denied Mr. Korelc's motion to preclude his

involuntary statements to law enforcement and allowed the statements to be used for impeachment purposes?" (Doc. 7, Exh. BB at 28.) And, his argument therein alleges that "Involuntary statements are not admissible at trial for any purpose. The trial court committed reversible error by allowing the state to impeach Mr. Korelc with his involuntary statements." (Doc. 7, Exh. BB at 28-36.) Failure to fairly present a Miranda claim has resulted in procedural default of that claim because Petitioner is now barred from returning to state courts. See Ariz.R.Crim.P. 32.2(a), 32.4(a).

Although a procedural default may be overcome upon a showing of cause and prejudice or a fundamental miscarriage of justice, see Coleman, 501 U.S. at 750-51, Petitioner has not established that any exception to procedural default applies. And, Petitioner's status as an inmate, lack of legal knowledge and assistance, and limited legal resources do not establish cause to excuse the procedural bar. See Hughes v. Idaho State Bd. of Corr., 800 F.2d 905, 909 (9th Cir. 1986) (an illiterate pro se petitioner's lack of legal assistance did not amount to cause to excuse a procedural default); Tacho v. Martinez, 862 F.2d 1376, 1381 (9th Cir. 1988) (petitioner's reliance upon jailhouse lawyers did not constitute cause). Accordingly, Petitioner has not shown cause for his procedural default.

Petitioner has also not established a fundamental miscarriage of justice. A federal court may review the merits of a procedurally defaulted claim if the petitioner demonstrates that failure to consider the merits of that claim will result in a "fundamental miscarriage of justice." Schlup, 513 U.S. at 327. The standard for establishing a Schlup procedural gateway claim is "demanding." House v. Bell, 547 U.S. 518, 538 (2006). The petitioner must present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial." Schlup, 513 U.S. at 316. Under Schlup, to overcome the procedural hurdle created by failing to properly present his claims to the state courts, a petitioner "must demonstrate that the constitutional violations he alleges ha[ve] probably resulted in the conviction of one who is actually innocent, such that a federal court's refusal to hear the defaulted claims would be a 'miscarriage of justice.'" House, 547 U.S. at 555-56 (quoting Schlup, 513 at 326, 327). To meet this standard, a petitioner must present "new reliable evidence – whether it be

exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." Schlup, 513 U.S. at 324. The petitioner has the burden of demonstrating that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id. at 327. Petitioner has failed to establish, let alone allege, a sufficient showing of actual innocence to establish a miscarriage of justice. Therefore, Petitioner cannot excuse his procedural defaults on this basis.

In any event, the record demonstrates that, although Petitioner was given his Miranda warnings, Petitioner was not in custody when he made statements to the police and, therefore, no warnings were needed. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 348 U.S. at 444; see California v. Beheler, 463 U.S. 1121, 1125 (1983) (In custody means "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."). Whether a suspect is in custody for purposes of Miranda is an objective test. See Yarborough v. Alvarado, 541 U.S. 652, 662–663 (2004); Stansbury, 511 U.S. at 323. The Supreme Court has recognized that as a practical matter, "'[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.'" Beheler, 463 U.S. at 1124 (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). However, "[t]he police are required to give Miranda warnings only 'where there has been such a restriction on a person's freedom as to render him 'in custody.'" Id. (quoting Mathiason, 429 U.S. at 495). A suspect is in custody for purposes of Miranda when, considering the totality of the circumstances, a reasonable person would "have felt that he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995); see Stansbury, 511 U.S. at 322. The Ninth Circuit has identified several factors relevant to determining whether a custodial interrogation has occurred:

> Pertinent areas of inquiry include the language used by the officer to summon the individual, the extent to which he or she is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the

detention and the degree of pressure applied to detain the individual. Based upon a review of all the pertinent facts, the court must determine whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave.

United States v. Booth, 669 F.2d 1231, 1235 (9th Cir. 1981) (citations omitted).

The record reflects that throughout the interview process at the apartment complex and at the nearby senior center close to Petitioner's residence, the questions by the detectives and officers were investigational in nature – no promises or threats were made, and Petitioner was never coerced or intimidated into explaining what had happened. (Doc. 7, Exhs. F, EE.) Petitioner was never placed in handcuffs, and Petitioner was never placed under arrest. (Doc. 7, Exhs. F, EE.) During the interview, Petitioner was "free to get up, walk around, use the bathroom, [and] get water." (Doc. 7, Exhs. F, EE.) And, according to the testimony at the June 26, 2009 evidentiary hearing, if Petitioner did not want to talk to police, he would have been free to leave. (Doc. 7, Exhs. F, EE.) At the end of the interview, Petitioner was given a telephone, and he called one of his sons to let him know that the police were going to drive him to his home. (Doc. 7, Exhs. F, EE.) Not until Petitioner had made an incriminating statement when clarifying inconsistencies between his statements and the physical evidence was Petitioner ultimately placed under arrest. (Doc. 7, Exhs. F, EE.)

Further, although the record indicates that Petitioner appears to have asked the detectives to state their opinion as to whether they would want an attorney, Petitioner never unambiguously requested counsel. See Davis v. United States, 512 U.S. 452, 459, 461 (1994) (The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Where there has been only an equivocal or ambiguous assertion of the right to counsel in that context, the attending officer may ask questions to clarify the defendant's wishes, but is not required to do so and may simply "continue questioning until and unless the suspect clearly requests an attorney.").

Lastly, even if Petitioner's statements were obtained in violation of Miranda, the statements would be properly admitted if the statements were voluntary and were used only

for impeachment purposes. A voluntary statement taken in violation of <u>Miranda</u> may be introduced at trial for impeachment purposes. <u>See</u> <u>Harris v. New York</u>, 401 U.S. 222, 226 (1971); <u>Doody v. Schriro</u>, 548 F.3d 847, 860 n. 13 (9th Cir. 2008). Since it is uncontested that Petitioner's statements were introduced for impeachment purposes, the question before the Court is whether Petitioner's statements were voluntary.

### 2. Voluntariness

Petitioner alleges that his statements made to the police were involuntary. A confession must be voluntary to be admitted into evidence. <u>See</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 433 (2000). A confession that is other than "the product of an essentially free and unconstrained choice by its maker ... offends due process." <u>Doody v. Schiro</u>, 596 F.3d 620, 638 (9th Cir. 2010) (en banc) (quoting <u>Schneckloth v. Bustamante</u>, 412 U.S. 218, 226 (1973)). "There is no 'talismanic definition of voluntariness' that is 'mechanically applicable.'" <u>Clark v. Murphy</u>, 331 F.3d 1062, 1072 (9th Cir. 2003) (quoting <u>Schneckloth</u>, 412 U.S. at 224). Rather, voluntariness is to be determined in light of the totality of the circumstances. <u>See</u> <u>Miller v. Fenton</u>, 474 U.S. 104, 112 (1985); <u>Haynes v. Washington</u>, 373 U.S. 503, 513 (1963); <u>Beatty v. Stewart</u>, 303 F.3d 975, 992 (9th Cir. 2002). This includes consideration of both the characteristics of the petitioner and the details of the interrogation. <u>See</u> <u>Schneckloth</u>, 412 U.S. at 226. Relevant circumstances that should be considered in determining whether a confession was voluntarily made include the following factors: (1) the youth of the accused; (2) his/her intelligence; (3) the lack of any advice to the accused of his/her constitutional rights; (4) the length of the detention; (5) the prolonged nature of the questioning; and (6) the use of any punishment such as the deprivation of food or sleep. <u>See</u> <u>id.</u>

The testimony presented at the evidentiary hearing on Petitioner's motion to suppress reflects that the police officers who responded to "a shooting call" questioned Petitioner initially at his residence. (Doc. 7, Exh. EE at 16; Exh. F at 15, 57.) Officer Eric Reed began asking Petitioner questions regarding what had happened and Petitioner responded. (Doc. 7, Exh. EE at 16; Exh. F at 58.) The record demonstrates that Petitioner was not in handcuffs,

was not under arrest, and was "coherent" and "responsive" at that time. (Doc. 7, Exh. F at 59-61.) After "perceiv[ing] a few comments from him that were incriminating in nature," Officer Reed testified that he read Petitioner his <u>Miranda</u> rights "out of an abundance of caution." (Doc. 7, Exh. F at 60.) However, Officer Reed stated again that Petitioner was not placed in handcuffs and was not under arrest. (Doc. 7, Exh. F at 60-61.)

While informing Petitioner of his rights pursuant to <u>Miranda</u>, Officer Reed stated: "The first time I told him he had the right to remain silent, he said he knew. I stopped him. I asked him to let me finish with what I was going to tell him, and I got through the third point in the *Miranda* warnings and I asked him if he understood what I said to him to that point, and at that point he asked if he could speak to his son, which I told him no, and I asked him once more; I asked if he understood his rights." (Doc. 7, Exh. F at 61.)

The record reflects that, at this point, Officer Reed began to read the <u>Miranda</u> warning again from the beginning. (Doc. 7, Exh. F at 61-62.) In response, Petitioner asked if he was under arrest, and Officer Reed testified, "I told him he was not. I asked him [if] he was in handcuffs – excuse me, I said – I asked him if he was in handcuffs. He said no. And I told him that we were just talking at that point." (Doc. 7, Exh. F at 62.)

The testimony indicates that Officer Reed then engaged Petitioner in "small talk," and did not ask him any more questions about the shooting. (Doc. 7, Exh. F at 62-63.) Officer Reed agreed that Petitioner was being detained as a "material witness," but was not under arrest. (Doc. 7, Exh. F at 68-70.) When detectives arrived on the scene, Officer Reed told them he was not sure if Petitioner understood his rights. (Doc. 7, Exh. F at 69.)

Then, with Petitioner's consent, Detectives Hugh Lockerby and Thomas Van Meter questioned Petitioner a nearby senior center close to his residence. (Doc. 7, Exh. F at 6-7, 14, 18.) Detective Lockerby testified that Petitioner was not in handcuffs and was not under arrest. (Doc. 7, Exh. F at 15.) Detective Lockerby stated that if Petitioner had indicated that he did not want to talk with the police, he "would have had to have let him go." (Doc. 7, Exh. F at 42-43.)

According to the record, the interview lasted almost six hours inclusive of breaks, and that during that time Petitioner was "free to get up, walk around, use the bathroom, [and] get water." (Doc. 7, Exh. EE at 16; Exh. F at 18-19.) Petitioner was tested for gunshot residue and his clothes were collected; Petitioner was given a "bunny suit" to wear. (Doc. 7, Exh. EE at 16; Exh. F at 18-19, 47-48, 50-51.)

At the end of the interview, Petitioner was still not under arrest; Petitioner was given a telephone, and he called one of his sons to let him know that the police were going to drive him to his home. (Doc. 7, Exh. F at 19-23, 55.) The testimony states that Detective Van Meter was going to drive Petitioner to his son's home, (Doc. 7, Exh. F at 19, 83-84), but before he could do this, Sergeant Joseph Nichols requested to speak with Petitioner about certain inconsistencies between his statements and the physical evidence, (Doc. 7, Exh. EE at 16-17; Exh. F at 77-79). The record again reflects that Petitioner was not under arrest at this time, and that Petitioner was "free to walk away" if he did not want to talk to Sergeant Nichols. (Doc. 7, Exh. EE at 17; Exh. F at 83.) According to the testimony, Petitioner was ultimately placed under arrest when he stated that "he had taken a gun, turned it around in his hand, stepped away and that the gun went off." (Doc. 7, Exh. F at 84.) Sergeant Nichols testified that if Petitioner had not made this incriminating statement, he would not have been arrested. (Doc. 7, Exh. F at 87.)

The Court has reviewed the pleadings, reporter's transcript of the evidentiary hearing on Petitioner's motions to suppress, and the state court's decision, and concludes that Petitioner has failed to demonstrate that the state court's adjudication of his voluntariness claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.

As identified by the state court and confirmed by the testimony presented in the evidentiary hearing, at both the apartment complex and the senior center, the questions asked of Petitioner were investigatory rather than accusatory in nature. There was no coercive police activity. There were no threats or promises made to Petitioner, and there was no evidence or testimony demonstrating that Petitioner's age, education, or intelligence was an

issue during the investigation. Further, although the hearing testimony does not confirm whether or not Petitioner actually understood the <u>Miranda</u> warning given to him, the record reflects that during the six-hour interview, Petitioner was never placed in handcuffs, was given opportunities to "get up, walk around, use the bathroom, [and] get water," was not in custody, and was free to leave. In fact, arrangements were being made for one of the officers to drive Petitioner home up and until one of the detectives followed-up with Petitioner regarding some inconsistencies between the physical evidence and his statements. Thus, the Court finds no error.

**E.    Ground Four**

In Ground Four, Petitioner alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated when he received ineffective assistance of counsel. (Doc. 1 at 9; Doc. 4.) According to Petitioner, his counsel's performance was deficient because counsel failed to call certain witnesses – Andrew Orozco, Claire Rambeau, and Mark Korelc (Petitioner's son). (Doc. 1 at 21.)

Petitioner also argues that his counsel was ineffective for failing to request certain jury instructions. (Doc. 1 at 19.) Petitioner states that counsel "failed to request a self defense jury instruction, justified homicide, accidental shooting, excusable homicide and a crime prevention jury instruction." (Doc. 1 at 19, 20.) He contends that "[t]hese instruction[s] were important to request because they went to the heart and theory of the defense." (Doc. 1 at 20.)

In denying Petitioner's claims of ineffective assistance of counsel alleged in his PCR petition, the trial court stated, in pertinent part:

Defendant claims that trial counsel rendered ineffective assistance by:

- failing to explain the ramifications of testifying,
- requesting jury instructions for only manslaughter and negligent homicide
- not contesting the search of defendant's residence,
- not calling three witnesses, and
- not having the victim or holster tested for gunshot residue.

To prove ineffective assistance of counsel, a defendant must affirmatively show:

1. That counsel's performance fell below an objective standard of reasonableness as defined by prevailing professional norms (the deficient performance prong); and

2. That but for counsel's error(s), there is a reasonable probability that the outcome of the case would have been different (the actual prejudice prong).

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Rosario*, 195 Ariz. 264, 987 P.2d 226 (App. 1999).

Decisions concerning trial strategy and tactics, including whether to file certain motions, whether to call certain witnesses including an expert, and whether to pursue certain defenses are entrusted to trial counsel. *State v. Lee*, 142 Ariz. 210, 689 P.2d 153 (1984). A defendant will not be allowed to litigat[e] such claimed trial errors unless counsel's decision was so egregious as to constitute ineffective assistance. *State v. French*, 198 Ariz. 119, 7 P.3d 128 (App. 2000). There can be no ineffective assistance of trial counsel unless counsel's decisions have no reasonable basis. *State v. Sammons*, 156 Ariz. 51, 56, 749 P.2d 1372, 1377 (1988). Courts indulge a strong presumption that trial counsel's conduct is attributable to trial strategy. *Strickland* at 689; *State v. Webb*, 164 Ariz. 348, 351,793 P.2d 105, 108 (App. 1990), citing *State v. Espinoza-Gamez*, 139 Ariz. 415, 417, 678 P.2d 1379, 1381 (1984).

This Court concludes that defendant has failed to affirmatively show that his claims of certain specific instances of non-action by trial counsel constitute anything other than trial strategy. Even assuming that counsel's non-action did not involve trial strategy, defendant has not shown that counsel's non-action was objectively unreasonable especially where defendant had the absolute right to choose whether or not to testify, defendant and his trial counsel never contended at trial that he acted in self-defense, defendant consented to a search of his residence, and defendant has proffered no proper proof of additional witnesses' testimony and the purpose of gunshot residue testing.

The Court further concludes that defendant cannot show by a reasonable probability that the jury verdict would have been different had defendant elected to not testify, or that the trial court would have given the requested jury instructions, or that the trial court would have suppressed any evidence from the consensual search of defendant's residence, or that the jury verdict would have been different because of the testimony of additional witnesses, or that gunshot residue testing would have yielded any admissible evidence that would have changed the outcome of the case.

(Doc. 7, Exh. SS at 3-4.) In denying Petitioner petition for review, the Arizona Court of Appeals adopted the trial court's analysis stating, "the superior court issued a ruling that clearly identified, fully addressed and correctly resolved the claims. Under these circumstances, we need not repeat that court's analysis here; instead we adopt it." (Doc. 7, Exh. YY.)

To establish a claim of ineffective assistance of counsel a petitioner must demonstrate that counsel's performance was deficient under prevailing professional standards, and that

he suffered prejudice as a result of that deficient performance. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). To establish deficient performance, a petitioner must show "that counsel's representation fell below an objective standard of reasonableness." Id. at 699. A petitioner's allegations and supporting evidence must withstand the court's "highly deferential" scrutiny of counsel's performance, and overcome the "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 689-90. A petitioner bears the burden of showing that counsel's assistance was "neither reasonable nor the result of sound trial strategy," Murtishaw v. Woodford, 255 F.3d 926, 939 (9th Cir. 2001), and actions by counsel that "'might be considered sound trial strategy'" do not constitute ineffective assistance. Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

To establish prejudice, a petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." Id. Courts should not presume prejudice. See Jackson v. Calderon, 211 F.3d 1148, 1155 (9th Cir. 2000). Rather, a petitioner must affirmatively prove actual prejudice, and the possibility that a petitioner suffered prejudice is insufficient to establish Strickland's prejudice prong. See Cooper v. Calderon, 255 F.3d 1104, 1109 (9th Cir. 2001) ("[A petitioner] must 'affirmatively prove prejudice.' ... This requires showing more than the possibility that he was prejudiced by counsel's errors; he must demonstrate that the errors actually prejudiced him.") (quoting Strickland, 466 U.S. at 693). However, the court need not determine whether counsel's performance was deficient if the court can reject the claim of ineffectiveness based on the lack of prejudice. See Jackson, 211 F.3d at 1155 n.3 (the court may proceed directly to the prejudice prong).

### 1.     Trial counsel was ineffective for failing to call certain witness

Petitioner alleges his counsel's performance was deficient because counsel failed to call certain witnesses – Andrew Orozco, Claire Rambeau, and Mark Korelc (Petitioner's son). (Doc. 1 at 21.) Petitioner states that Andrew Orozco would have testified to "the events

that occurred regarding the aggravated assault and armed robbery charges," and also that "the victim Irving Fleming lied about those events and that his story was incredible as well as he witnessed first hand how aggressive the victim [] was toward Petitioner." (Doc. 1 at 21, 22.) Petitioner states that his son "would of testified to the fact that on November 9th 2007 he was on his way over to the Petitioner's house for a BBQ party so he could of testified that there was no intent ... ." (Doc. 1 at 21, 22.) Lastly, Petitioner states that Claire Rambeau "would of testified to the fact that the victim [] was the aggressor and had violent outburst ... ." (Doc. 1 at 21, 22.) The Court finds that Petitioner has failed to demonstrate deficient performance or resulting prejudice.

"The power to decide questions of trial strategy and tactics rests with counsel and the decision as to what witnesses to call is a tactical, strategic decision." Faretta v. California, 422 U.S. 806 (1975). "There are a number of reasons why an attorney may choose not to call a witness, including a concern that ... his participation in the defense may harm the defendant more that his testimony ... will aid him." State v. Goswick, 691 P.2d 673, 677 (Ariz. 1984). "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative. ... In addition, for [petitioner] to demonstrate the requisite *Strickland* prejudice, [he] must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002) (citations omitted); see United States v. Harden, 846 F.2d 1229, 1231–32 (9th Cir. 1988) (rejecting claim of ineffective assistance based on counsel's failure to call a witness who would have taken responsibility for a gun found in defendant's possession because "[t]here is no evidence in the record which establishes that [the witness] would testify in [petitioner's] trial."). Further, a "difference of opinion as to trial tactics ... alone generally does not constitute a denial of effective assistance of counsel." U.S. v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981); see Gustave v. U.S., 627 F.2d 901, 904 (1980) ("Mere criticism of a tactic or strategy is not in itself sufficient to support a charge of inadequate representation.").

Initially, the Court notes that, at best, Petitioner only speculates as to these witnesses' proposed testimony and whether any of them would have testified as he alleges. "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." U.S. v. Ashimi, 932 F.2d 643, 650 (7th Cir. 1991). More generally, conclusory allegations that are not supported by specific facts do not merit habeas relief. See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).

Petitioner contends that Andrew Orozco would have testified that Petitioner had not committed other acts against Irving Fleming that were introduced at trial. However, at trial, Petitioner's counsel introduced evidence demonstrating that Petitioner was acquitted of the acts involving Irving Fleming, (Exh. Q at 19–21), and Petitioner also testified that the prior acts did not occur (Exh. T at 6–19). Thus, counsel could have reasonably determined that there was no need to call Orozco as a witness, which may have further amplified the other acts in the jurors minds. The jurors had already heard testimony of the acquittals – any further testimony would have been cumulative. And, any contention that Orozco would have testified to the aggressive nature of the victim or that she had a "violent outburst" when Petitioner was preparing for a barbeque, is entirely speculative. Moreover, counsel may have ultimately determined that calling Orozco – Petitioner's friend who lived "just two doors down" from Petitioner and who was drinking beers with Petitioner on the day of the incident – would have been more harmful than beneficial. Counsel developed a trial strategy to present Petitioner's defense. The fact that Petitioner now disagrees with that strategy because he is unhappy with the trial's outcome does not mean that his counsel rendered ineffective assistance.

As to Claire Rambeau, Petitioner alleges that she would have testified that the victim "was the aggressor and had violent outburst toward Petitioner." Petitioner cites to an "incident investigation report" in support of his claim. The report includes a narrative discussion documenting an investigative officer's interview of Rambeau – who was

Petitioner's neighbor that lived in the same apartment complex – the day of the incident. According to Rambeau, she never had any problems with Petitioner and the victim. She stated that they were "generally peaceful," although they had arguments "about taking out the garbage and things like that, but never saw it get out of hand." Rambeau stated that the victim was "always more aggressive in the arguments and [Petitioner] would always back down." She had seen times where the victim was screaming in Petitioner's face, and "he would just walk away," and added that Petitioner was "always gentle and Rosa was always the aggressor." When asked again if she "noticed any increase in arguments recently or an increase in any types of altercations, fights, pushing etc.," Rambeau stated that the couple "seemed to be in love with each other" and said they were planning on getting married when they got their finances in order. Again, counsel may have determined that calling Rambeau would have been more harmful than beneficial to his theory of defense and trial strategy. Petitioner's disagreement with that strategy after the fact does not equate to ineffective assistance.

Lastly, Petitioner states that his son "would of testified to the fact that on November 9th 2007 he was on his way over to the Petitioner's house for a BBQ party so he could of testified that there was no intent on the Petitioner's part to commit[] the alleged offense or at least a credible character witness." The record reflects that there was never any suggestion or argument by the State that Petitioner shot the victim pursuant to a preconceived plan. Thus, any evidence or testimony presented regarding an invitation to a barbecue on the day of the incident purportedly negating any plan to commit murder would have been insignificant. Further, counsel again may have determined that calling Mark – Petitioner's son who along with his brother Chris were involved in the initial part of this case – to testify as a "character witness" would have been more harmful than beneficial to his theory of defense and trial strategy.

In any event, Petitioner has failed to demonstrate a reasonable likelihood that had if any of these witnesses would have testified, the outcome of the trial would have been different. As set forth by the Arizona Court of Appeals, (Doc. 7, Exh. EE at 2-3), the State

offered overwhelming evidence of Petitioner's guilt, including, the physical evidence at the scene, the testimony of the officers and experts, Petitioner's own statements, and Petitioner statements on the witness stand. Any speculation that these three witnesses' testimony would have changed the outcome of Petitioner's trial is insufficient to establish prejudice.

The state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

### 2. Trial counsel was ineffective for failing to request certain jury instructions

Petitioner also argues that his counsel was ineffective for failing to request certain jury instructions. (Doc. 1 at 19.) Petitioner states that counsel "failed to request a self defense jury instruction, justified homicide, accidental shooting, excusable homicide and a crime prevention jury instruction." (Doc. 1 at 19, 20.) He contends that "[t]hese instruction[s] were important to request because they went to the heart and theory of the defense." (Doc. 1 at 20.) In support of his claim, Petitioner states that he –

> told his girlfriend Rosalind (victim) that he was moving out and he was breaking up with her. The Petitioner had his gun on the table then the victim Rosalind Guss said I'll kill us both pulled the gun toward her picked it up off the table Petitioner grabbed the gun while it was in her hand and the gun discharged by accident. Petitioner prevented a crime from occurring against him so a selfdefense and crime prevention instruction would have been appropriate. A crime scene specialist named Mark Carpenter testified that he observed a layer of dust across the table with finger mark swipes across the table consistent with Petitioners story that the victim was pulling the gun toward herself.

(Doc. 1 at 20.)

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 687. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690–91. "[S]trategic or tactical decisions on the part of counsel are presumed correct, unless they were completely

unreasonable, not merely wrong." <u>Moore v. Marr</u>, 254 F.3d 1235, 1239 (10th Cir. 2001). Counsel's decisions regarding jury instructions are fairly construed as a strategic decision, <u>see, e.g,</u> <u>Scott v. Elo</u>, 302 F.3d 598, 607 (6th Cir. 2002), and an attorney does not render ineffective assistance by failing to request jury instructions or by objecting to proposed instructions that are inconsistent with his trial theory, <u>see, e.g.,</u> <u>Butcher v. Marquez</u>, 758 F.2d 373, 377 (9th Cir. 1985).

Petitioner has failed to demonstrate deficient performance in failing to request these instructions. Initially, the Court notes that "excusable homicide" and "justified homicide" are not specific defenses in Arizona, but fall under the justification theories of defense set forth in Chapter 4 of Arizona's Criminal Code. The justification theories of defense under this Chapter include specific defenses, such as, self-defense and crime-prevention defenses. <u>See</u> A.R.S. § 13–401, <i>et. seq.</i>

As to Petitioner's argument that counsel was ineffective for failing to request an "accident" instruction, a "party is entitled to an instruction on any theory reasonably supported by the evidence." <u>State v. Rodriguez</u>, 192 Ariz. 58, 61, ¶ 16, 961 P.2d 1006, 1009 (1998). "Nevertheless, a trial court generally is not required to give a proposed instruction when its substance is adequately covered by other instructions." <u>Id.</u> Here, the record reflects that the trial court properly instructed the jury on the applicable law regarding the charged offense, as well as, the lesser-included offenses of manslaughter and negligent homicide, which were requested by counsel. In conjunction with these instructions, counsel thoroughly argued an "accident" theory of the case throughout the trial and, specifically, in closing argument stating, in part:

> Ladies and gentlemen, this was a tragic, tragic shooting. That's given, but in no way, shape or form did my client intend to harm Rosalind Guss either intentionally or recklessly in this case, and the State has failed to show that evidence to you beyond a reasonable doubt, and the defense theory in this case does make sense, despite the fact that my client wasn't a perfect witness, but he was a man who found himself in a very irrational situation, upset, distraught and confused. Look at it from that point of view. It's easy to sit here in a table and make all these you should have done this rationally, you should have done that rationally. Put yourself in my client's shoes and look at it from where he found himself that day and ask yourself if you had been able to make all the

rational decisions that he apparently didn't make, but he didn't run. Thank you.

\*       \*       \*

That's not the theory of our defense. Our defense is the gun went off. Might have very well been in my client's hands . I conceded that at the beginning of this case. It was my client's gun and the gun might have went off and it might have been in my client's hands. That's not what makes my client guilty. What makes my client guilty is his mental state.

\*       \*       \*

Intentionally intending to kill somebody. I mean, if my client had intended to kill Rosalind the way the State wants you to believe, he could have done it a lot of other ways. Take her out to the desert to go shooting guns. I mean, think of all the scenarios that could have happened. The State wants you to believe this one particular theory with zero evidence.

\*       \*       \*

My client loved that woman. He did not intend to harm that woman, and this is a tragedy. When you look at all the measurements and everything else, the simple fact of the matter is we just don't know. My client doesn't know if the gun was in his hand, her hand, where the holster was, if it was shot through the holster. We have to cover all this evidence just to get to where we're at.

\*       \*       \*

The other aspect you need to consider in this case is my client's actions afterwards. He made no efforts whatsoever to hide his involvement in this case. Now, if he had done this intentionally, what would he have done? Could he have thrown the gun away? Reloaded it to make it look like a bullet wasn't fired out of his gun? If he'd done it intentionally, picked up the shell and taken the shell away, maybe make it look like somebody else did this and not him?

None of these things he did that would indicate the possibility of somebody intentionally doing something like this. All the evidence points to the fact that this was a tragic accident, as we testified, as we presented the evidence.

\*       \*       \*

The defense's theory makes sense. I don't know whose theory makes more sense. That's up to you to decide, but all we have to have is a real possibility, and this case is chock full of that. In fact, this case is chock full of evidence suggesting this is nothing more than a tragic, tragic accident, and accidents sometimes happen. Just because somebody dies from a gunshot wound doesn't mean somebody's guilty of a crime, but it is a tragedy, and we're asking you to render a verdict of not guilty. Thank you.

Regarding the justification theories of self-defense and crime-prevention, based on the evidence and testimony at trial including the various conflicting "versions of the story" that Petitioner presented to the police during the investigation, the record reflects that counsel

- 36 -

made strategic and tactical decisions consistent with the facts of the case. As the trial court noted in its decision, Petitioner "never contended at trial that he acted in self-defense," nor did he affirmatively state that he shot the victim in order to prevent a crime. Thus, consistent with his theory of defense, counsel requested and received instructions on the lesser offenses of manslaughter and negligent homicide, and argued an "accident" theory of the case.

Furthermore, Petitioner has failed to establish that if counsel would have requested these defenses, the outcome would have been different.

Petitioner has not shown that the state court's rejection of this claim was contrary to, or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts. Petitioner is not entitled to relief on this claim.

## CONCLUSION

Having determined that all of the claims alleged in Petitioner's habeas petition fail on the merits, and that Petitioner's <u>Miranda</u> claim alleged in Ground Three is procedurally defaulted, the Court will recommend that Petitioner's Petition for Writ of Habeas Corpus be denied and dismissed with prejudice.

**IT IS THEREFORE RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** and **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **DENIED** because Petitioner has not made a substantial showing of the denial of a constitutional right.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. <u>See</u> 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure. Thereafter, the parties have fourteen days within which to file a response to the objections. Pursuant to Rule 7.2, Local Rules of

Civil Procedure for the United States District Court for the District of Arizona, objections to the Report and Recommendation may not exceed seventeen (17) pages in length. Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review. See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. See Rule 72, Federal Rules of Civil Procedure.

DATED this 7th day of March, 2018.

Michelle H. Burns
United States Magistrate Judge